**UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

CLINT DESTINO,

        Plaintiff,

v.                                                  Civ. No. 20-397 MV-GJF

CENTURION MEDICAL SERVICES, *et al.,*

        Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Defendant Centurion Correctional Healthcare of New Mexico, LLC's[1] First Motion for Summary Judgment [ECF 23] ("FMSJ") and Defendant Moriama Valeriano's Motion for Summary Judgment [ECF 24] ("MSJ") (collectively "Motions"). The Motions are fully briefed.  *See* ECFs 26–27 (asserting that Plaintiff Clint Destino neither responded nor moved for an extension).  Defendants filed a joint *Martinez* report on April 26, 2023.  ECF 22 ("Rpt.").  For the reasons set forth below, the Court concludes that it lacks subject matter jurisdiction because Plaintiff has not satisfied the Prison Litigation Reform Act's ("PLRA") exhaustion requirement.  The Court therefore recommends **GRANTING** the Motions and **DISMISSING** this case **WITHOUT PREJUDICE**.

---

[1] Plaintiff misidentified Defendant Centurion in his Complaint and, thus, the caption contains this misnomer.

## I.   BACKGROUND[2]

### A.  Inmate Grievance Policies and Procedures

At all times relevant to this lawsuit, the New Mexico Corrections Department ("NMCD") oversaw the Lea County Correctional Facility ("LCCF") and, via contract, delegated inmate medical care to Defendant Centurion.  Rpt. at 4.  NMCD's "Polic[ies] and Procedure[s]" apply to Centurion, which meant, among other things, that Centurion's medical services were subject to LCCF's inmate grievance policy.  Rpt. at 4, 14 (internal quotations and alterations omitted) ("With few exceptions, all matters relating to conditions of care or supervision within the authority of the NMCD or its contractors can be grieved.");  *accord* ECF 22-5 at 2, 4; 22-3 at 2, 74.

By contract, the GEO Group, Inc. ("GEO") oversaw NMCD's inmate grievance policy. Rpt. at 13.  To do so, GEO employed a grievance officer—the "person(s) at each institution designated to receive formal grievances from inmates and to investigate" if not resolve them.  Rpt. at 13; ECF 22-3 at 2.  Defendant Valeriano was LCCF's grievance officer.  Rpt. at 13; *see also* ECF 22-8 at 5 (noting that the grievance officer's primary responsibility is managing and resolving inmate grievances).

Typically, an inmate would file an "informal complaint"—the preliminary step before escalating to a "formal grievance."  ECF 22-8 at 9.  To file an informal complaint, the inmate was required to use form CD-150510.3 and: (1) include a detailed explanation of the circumstances that must also be (2) timely—the inmate must deposit his complaint in one of LCCF's designated grievance boxes "within five [ ]working days from the date of the incident giving rise to the complaint."  *Id.*  The grievance officer then forwarded the complaint to the proper recipient whose

---

[2] Because Plaintiff does not contest the operative facts set forth in this Order, they are deemed admitted for purposes of summary judgment.  D.N.M.LR-Civ. 56.1.  Any disputes of fact not addressed are disputes that the Court considers immaterial.

role was to "make every effort to resolve [it] within five [ ] working days from receipt" and document the response.  *Id.*  Once the grievance was addressed, Defendant Valeriano returned a copy of the complaint to its author.  If the inmate received no response within ten working days, or if he was dissatisfied with the response given, the inmate then was permitted to file a formal grievance.  *Id.*  The inmate was required to use a different form, CD-150501.1, and: (1) "briefly summarize the complaint," (2) "state what reasonable relief is being requested as a solution," (3) include a copy of the informal complaint, and (4) place it in a grievance box no more than five working days after receiving the response to his informal complaint.  Defendant Valeriano returned any noncompliant grievances to the inmate for completion.  *Id.* at 10.  Dissatisfaction with a formal grievance's resolution entitled the inmate to appeal to the Secretary of Corrections within five working days of the formal grievance's resolution.  An inmate exhausted administrative remedies only after appeal to the Secretary.  *Id.*

An "emergency grievance," in contrast, proceeded on an expedited timeline—but only if the inmate's grievance posed a bona fide emergency.  The inmate was responsible for proving such circumstances existed by showing "indications of potential and substantial risk to the life or safety of the individual" or imminent and "irreparable harm to the individual's health."  Rpt. at 15. Procedurally, an emergency grievance required: (1) "designat[ing] the grievance as an emergency" on the informal complaint form, CD-150501.1, and (2) filing within five days of the purported emergency.  ECF 22-8 at 7, 9.  The grievance officer then decided whether the grievance presented a bona fide emergency and, if so, the warden was obliged to respond within three working days. *Id.* at 7–8.  Importantly, merely captioning an informal complaint as an emergency grievance did not automatically trigger the expedited response deadline.

### B. Factual Background

This lawsuit arose from an inmate injury and attempted use of the inmate grievance policy. At all relevant times, Plaintiff was incarcerated at LCCF. *See* Rpt. at 1–2; *accord State of N.M. v. Clinton R. Destino*, No. D-1215-CR-201300641 (Alamogordo Dist. Ct. Dec. 18, 2013) (convictions for vehicular burglary and four petty theft offenses). In August 2014, he sat through an orientation session that explained the grievance process and provided him with an "inmate handbook." *E.g.*, Rpt. at 16–17.

Plaintiff was still incarcerated on May 14, 2018, when he fell and broke his left wrist in an LCCF hallway. *Id.* at 5; *accord* ECF 1-2 at 4 ("Compl."). Beyond that incident itself, the parties disagree on most things.[3] But the medical records make this much clear: x-ray imaging occurred the following day; Plaintiff obtained a consultation that same week with an offsite orthopedic surgeon; and the surgeon told Plaintiff that he had multiple treatment options. ECF 25 at 000227–30 (post-op instructions); ECF 25-1 at 001205 (record of the May 18, 2018, office visit and consultation), 0001205–06 (surgeon's splint directions). Plaintiff elected surgery, so the surgeon instructed Plaintiff to leave his wrist splinted until the surgeon had time to operate. ECF 25-1 at 001205. Plaintiff underwent off-site reconstructive surgery on June 7 and, afterwards received the surgeon's post-operation care instructions—which included not removing his splint or changing his bandages. ECF 25 at 000228. Centurion provided Tylenol #3 to Plaintiff both before and after surgery, and his wrist healed without deformity. ECF 25-1 at 000873 (medication administration

---

[3] Plaintiff alleges that Centurion providers essentially ignored his "excruciating pain," gave him a bandage "[r]ather than send[ing] [him] to the hospital," and unnecessarily delayed his x-ray imaging. Compl. at 4. He also alleges being issued extremely mild painkillers—iprin and IBUs—and unduly rejected his repeated requests for more. *id.* at 6; *but see id.* at 8 (explaining that he took more painkillers than recommended); ECF 25-1 at 000973 (discontinuing a medication "due to abuse"), 00975 (same). Plaintiff also claims to have noticed that his wrist was crooked and lacked full mobility. *Id.* at 9 (claiming to have experienced "the worst pain of [his] life"). But the record flatly refutes Plaintiff's story. More importantly, the issues posed by this version of events are mooted by Plaintiff's failure to serve the defendants he named in his medical negligence claim.

record), 000980 (more evidence of Tylenol); ECF 25 at 000233 (observing the wrist healed without deformity).

Notwithstanding his splint, painkillers, and scheduled surgery date, Plaintiff apparently believed that "nothing was happening" to address his broken wrist and turned to the grievance policy.  ECF 1-2 at 4.  Plaintiff lodged an emergency grievance with Defendant Valeriano which, although dated on May 16, did not appear in a grievance receptacle until May 22.  *See id.* at 19 (accusing a nurse practitioner of wrongdoing for not sending him "to the hospital to get [his] arm fixed" the day that he fell); ECF 22-7 at 4 (Valeriano asserting that she received the grievance on May 22).  Although untimely, she referred Plaintiff's grievance to the medical department anyway.  ECF 22-7 at 4 ("The informal complaint addressed an issue that occurred on May 14[,] but the complaint was not received by me until May 22."); Rpt. at 17.[4]  On May 28, medical staff determined that Plaintiff's complaint was not a bona fide emergency grievance and notified him in writing the following day.  ECF 22-7 at 4; Rpt. at 17 (noting that X-rays were taken the day after Plaintiff broke his wrist with off-site consultation pending).

Apparently dissatisfied, Plaintiff filed a formal grievance but did not follow relevant policy requirements.  ECF 22-7 at 4–5 (observing that Plaintiff's first formal grievance neither made a request for relief nor included a copy of the informal complaint, both of which NMCD policy requires).  To attempt to cure the deficiency, Plaintiff wrote "medical attention for injury" in the

---

[4] Plaintiff insists that his initial grievance should have been answered within three working days because he wrote "Emergency Medical Grievance" at the top of the form and submitted it within five working days of his slip-and-fall. Compl. at 5, 19.  But the operative date of his grievance is not the date listed on the form, but the date that Defendant Valeriano received it—May 22.  More importantly, the grievance presented no exigent circumstances, and standard complaints do not require a five-day turnaround—the policy merely encourages it.  And even if the grievance was received on May 16—unlikely, given that Plaintiff himself claims to have placed the grievance in the box on May 17—Defendant Valeriano forwarded it to the appropriate staff member for response on May 23, which was within five working days.  *Compare* ECF 22-7 at 4 (dating receipt of the first grievance as May 22), *with* ECF 6 at 3 (Plaintiff admitting that he "put Grevance [*sic*] in" on May 17).

relief section. *Id.* But he did not include a copy of his informal complaint. *Id.* In tandem, and at Plaintiff's request, another inmate filed three more grievances, all concerning Plaintiff's injury or the grievance policy itself. *Id.* at 5–7. Although these subsequent grievances similarly failed to conform to formatting and procedural requirements, Defendant Valeriano nonetheless forwarded each one to the medical department for review. *Id.* at 7. Medical personnel rejected the first and third grievances as untimely. *Id.* at 6–7. As for the second grievance, which targeted Valeriano, an associate warden investigated the complaint and, after personally interviewing Plaintiff, the associate warden resolved the grievance without further action needed. *Id.* at 6 (relating that Plaintiff "was satisfied with the medical facility's decision.").

### C. Procedural History

On December 12, 2019, Plaintiff filed the instant case in New Mexico state court. Compl. at 1. On April 23, 2020, after Defendant Valeriano already answered the Complaint, Defendant Centurion removed to this Court. ECF 1 at 1–3; ECF 3-1 at 59–68. To develop the record, the Court ordered a *Martinez* Report on November 28, 2022. ECF 11; *accord Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). Plaintiff's Complaint alleges two causes of action: (1) negligent training and supervision as to Defendant Valeriano and (2) medical negligence as to Defendant Centurion.[5] Each Defendant has, in turn, responded with a motion for summary judgment. FMSJ; MSJ. Plaintiff filed no response to either motion. *See* ECFs 26–27. Even as of today, Plaintiff has remained silent.

---

[5] Plaintiff initially named NMCD along with a laundry list of Centurion, LCCF, and GEO employees, but only his claims against Defendants Centurion and Valeriano remain. *See generally* ECF 17 at 1–3 (recommending dismissal for the other five defendants because Plaintiff neglected to provide addresses for these defendants such that the Court could order service by the U.S. Marshals Service); ECF 19 (adopting the Court's recommendation).

## II.  APPLICABLE LEGAL STANDARDS

### A.  Summary Judgment Standard

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material when it "might affect the outcome of the suit under the governing [substantive] law," and a dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see* D.N.M.LR-Civ. 56.1(b) ("[M]aterial facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

The movant must first demonstrate  "the absence of a genuine issue of material fact and entitlement to judgment as a matter of law" prima facie.  *E.g.*, *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."  *Id.* (quotations omitted).  The nonmovant must do so "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein"—all of which must be admissible evidence. *Id.* at 1309; *accord* Fed. R. Civ. P. 56(c).  When, as here, the nonmovant ignores their burden entirely, the silence functions as acceptance of all facts properly asserted in the MSJ and FMSJ. *See, e.g.*, D.N.M.LR-Civ 7.1(b); 56.1(b).  The Federal Rules of Civil Procedure, however, require that the Court independently assess whether summary judgment is appropriate.  *E.g.*, *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196 (10th Cir. 2002); *accord* Fed. R. Civ. P. 56(c).

"A 'judge's function' in evaluating a motion for summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial.'" *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1280 (2017) (Sotomayor, J., dissenting from denial of cert.) (quoting *Anderson*, 477 U. S. at 249).  In evaluating such a motion, the Court's discretion is limited in two respects.  First, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U. S. 654, 655 (1962)).  Second, the Court can only consider admissible evidence.  *E.g.*, *Standish v. Jackson Hole Mt. Resort Corp.*, 997 F.3d 1095, 1107 (10th Cir. 2021) (emphasis removed).

### B.  § 1983 Liability

Federal law provides that any "person" acting under color of state law who "subjects . . . [another] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.  "Persons to whom § 1983 applies" include "private defendants fulfilling a government function."  *E.g.*, *McGee v. Corizon*, 831 F. App'x 381, 384 (10th Cir. 2020) (unpublished) (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215–16 (10th Cir. 2003)); *see also Dubbs*, 336 F.3d at 1216 (applying § 1983 to "private entities acting under color of state law").

### C.  Substantive Due Process

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.[6]  "'Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference,'" no Fourteenth Amendment violation typically occurs when the State fails to "protect an individual against private [actors'] violence."  *DeShaney v. Winnebago Cnty. Dep't of*

---

[6] Notably, state administrative grievance procedures do not give rise to a procedural due process claim because "there is no independent constitutional right to state administrative grievance procedures."  *Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 948 (10th Cir. 2018) (unreported) (internal citations omitted).  Consequently, there is no liberty interest vested in a state's administrative grievance process.  *Id.*

*Soc. Servs.*, 489 U.S. 189, 196–97 (1989) (emphasis in original) (quoting *Harris v. McRae*, 448 U.S. 297, 317–318 (1980)).  But this rule is not without exception.

Prisoners are among the "groups of individuals who, because of state intrusion on their liberties, have substantive due process rights to adequate protection."  *JL v. N.M. Dep't of Health*, 169 F. Supp. 3d 1194, 1199 (D.N.M. Mar. 4, 2016).  An incarcerated individual is "completely depend[ent] on the state to satisfy basic human needs," and this "special relationship" between the state and the injured person extends § 1983 liability to private entities that assist the state in providing for those basic human needs.  *See, e.g.*, *Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017) (citing *DeShaney*, 489 U.S. at 198–200); *see also Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1261 (10th Cir. 1998).  A due process claim brought under the special relationship doctrine requires four showings from a plaintiff: (1) the existence of a "special relationship" such that plaintiff "completely depend[s] on the state to satisfy basic human needs," (2) a defendant's knowledge that plaintiff "was in danger or failed to exercise professional judgment regarding that danger," (3) a causal link between the defendant's conduct and the plaintiff's injuries, and (4) that the defendant's actions "shock the conscience."  *Amedei*, 867 F.3d at 1185 (quoting *DeShaney*, 489 U.S. at 198–200).  The "shock the conscience" standard poses a particularly high bar: negligence will not suffice.

### D.  Cruel and Unusual Punishment

Prisoner substantive due process rights include the Eighth Amendment's prohibition on cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), which imposes an affirmative obligation on state officials "to provide adequate medical care" to prisoners and pretrial detainees alike.  *E.g.*, *J.L.*, 169 F. Supp. 3d at 1199 (quoting *Gamble*, 429 U.S. at 103); *see also Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985).

It is well established that a state official (or private entity acting as one) does not violate this duty unless the official or entity acted with a sufficiently culpable mental state—"deliberate indifference to serious medical need[ ]." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Deliberate indifference involves two conditions: (1) objectively, the prisoner's medical need must be "sufficiently serious"; and (2) the prison healthcare official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety," subjectively knowing the facts from which danger can be inferred and in fact concluding that such danger does exist. *Gamble*, 429 U.S. at 104.

### E.  Exhaustion of Administrative Remedies

The PLRA prohibits lawsuits by any incarcerated person "with respect to prison conditions" under any federal law "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also* N.M. Stat. Ann. § 33-2-11(B) (requiring total administrative exhaustion before bringing state law claims challenging circumstances "substantially related to the inmate's incarceration"); *see generally Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("Prison conditions" refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").  Unless and until an inmate properly exhausts all available administrative remedies, a federal court lacks subject matter jurisdiction to review his claims.  *E.g.*, *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  Because grievance procedural requirements "will vary from system to system and claim to claim, . . . it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Ngo*, 548 U.S. at 93.

## III. PARTIES' PRIMARY ARGUMENTS

### A.  Plaintiff's Complaint

As it must, the Court will "liberally construe" Plaintiff's grievances and court filings because he is *pro se*.  *E.g.*, *Greer v. Dowling*, 947 F.3d 1297, 1302 (10th Cir. 2020); *but see, e.g.*, *Murray*, 312 F.3d at 1199 n.3 (*pro se* status does not relieve litigants from complying with the Federal Rules of Civil Procedure).  As the Court understands it, Plaintiff's negligent training and supervision claim rests on three contentions: (1) Defendant Valeriano was dutybound to ensure that she was not "negligently violating Plaintif's [*sic*] civil and const[itutional] rights, as well as [NM]CD and LCCF polic[ies]"; (2) she did, in fact, violate the aforementioned rights and policies; and (3) Plaintiff's injuries were foreseeable, ergo avoidable.  ECF 1-2 at 15.  But because he brings these claims under the Eighth and Fourteenth Amendments to the U.S. Constitution (as well as their New Mexico state constitutional analogues) and the Complaint does not even allege that Defendant Valeriano trained or supervised anyone,[7] the Court construes the claim as one of deliberate indifference to an inmate's medical needs.

Plaintiff's medical negligence claim unfolds in similar fashion: (1) Defendant Centurion had a duty to use its medical professionals' expertise in caring for Plaintiff; (2) Centurion staff violated relevant medical standards of care in triaging, treating, and prescribing painkillers for Plaintiff's fractured wrist; and (3) the aforementioned acts are the proximate cause of Plaintiff's physical, "psychological[,] and emotional suffering."  *Id.* at 15–16.

---

[7] No facts in the *Martinez* Report suggest that Defendant Valeriano is responsible for training or supervising anyone—indeed, her primary responsibility as LCCF's grievance officer was to implement the grievance policy.  ECF 22-8 at 5.  Indeed, the Report suggests that NMCD's grievance system training occurs at the state level through a "statewide grievance/disciplinary appeals manager" who "provide[s] training, guidance[,] and oversight for grievance officers." *Id.* at 4.  Consequently, the Court finds that the facts provide no basis from which a reasonable jury could conclude that Valeriano trained or supervised any NMCD officials connected to LCCF's inmate grievance procedures at all, much less negligently.

### B. Defendant Valeriano's Position

As to the claim against her in Count I, Defendant Valeriano responds in two ways. First, she argues that the Prisoner Litigation Reform Act deprives this Court of subject matter jurisdiction until Plaintiff exhausts his administrative remedies. MSJ at 10–16; *accord* 42 U.S.C. §1997e(a); N.M.S.A. § 33-2-11(B) (1978). Relying on her firsthand knowledge of the system and Plaintiff's grievances, Valeriano insists that Plaintiff must first appeal a procedurally compliant grievance to the Secretary of Corrections before filing suit in this Court. ECF 22-7 at 4–7 (Plaintiff's grievances were "properly handled in accordance with NMCD's standard grievance procedure"); *see also id.* at 1 (swearing that she has "personal knowledge of and regularly appl[ies] the Inmate Grievance policy" as LCCF's Grievance Officer). According to her, Plaintiff "did not properly exhaust the grievance process with respect to his complaints about [her] conduct" because he never appealed to the Secretary of Corrections. ECF 22-7 at 7.

Second, Defendant Valeriano attacks Plaintiff's claim on the merits. MSJ at 5–9. She emphasizes that Plaintiff proffers no evidence that she actually trained or supervised anyone at LCCF and, therefore, the Complaint does not actually state a claim against her. *Id.* at 6. Further, the calculus remains the same if the Court construed the Complaint as a due process violation. *Id.* at 6–8 (contending that the Fourteenth Amendment vests no entitlement in administrative grievance procedures, and New Mexico's state constitutional analog only applies to public bodies). Nor would it survive if viewed as a common law negligence claim. *Id.* at 8–9 (arguing that Plaintiff cannot prove the applicable standard of care or show damages).

### C. Defendant Centurion's Position

As a threshold matter, Defendant Centurion questions whether the Court should construe Plaintiff's medical negligence tort claim as a Fourteenth Amendment substantive due process

claim or an Eighth Amendment deliberate indifference claim.  FMSJ at 22.  Regardless, Centurion disputes both versions with the same reasoning: the facts here offer no reasonable jury the ability to return a verdict in Plaintiff's favor.  *Id.* at 21–24 (insufficient evidence that Centurion's choices "shock[ ] the conscience"), 24–26 (insufficient evidence of "deliberate indifference" to prisoner medical needs).

## IV. DISCUSSION

For the reasons set forth below, the PLRA requires dismissal of Plaintiff's claims because his failure to exhaust administrative remedies divests the Court of jurisdiction.  Even were that not the case, the Court concludes that no admissible evidence in the record or inferences that could be drawn from that evidence would enable any reasonable jury to find that Defendants violated Plaintiff's Eighth or Fourteenth Amendment rights.

### A.  Plaintiff Has Not Properly Exhausted Administrative Remedies

As explained above, the PLRA requires "[c]ompliance with prison grievance procedures" to "properly exhaust" administrative remedies.  *Bock*, 549 U.S. at 218.  Without total exhaustion, the PLRA divests federal courts of subject matter jurisdiction to hear an inmate's claim.  *E.g.*, *Steele v. Bureau of Prisons*, 355 F.3d 1204, 1208 (10th Cir. 2003), *abrogated on other grounds by Bock*, 549 U.S. at 211–212.[8]

The *Martinez* Report makes clear that Plaintiff never appealed his grievances to the New Mexico Secretary of Corrections.  *Compare* ECF 22-7 at 7 (Defendant Valeriano asserting personal knowledge that Plaintiff did not appeal to the Secretary of Corrections), *with* Compl. at 19–20, 23–26 (several of Plaintiff's grievances, notably missing any documentary evidence of appeal).  The evidence shows, therefore, that Plaintiff only began the grievance process—he did

---

[8] New Mexico's state equivalent, § 33-2-11(B), similarly strips the Court of jurisdiction over Plaintiff's state statutory claims.  N.M. Stat. Ann. § 33-2-11(B) (1990).

not exhaust it.  "An inmate who begins the grievance process but does not complete it is barred from pursuing a [federal] claim under the PLRA for failure to exhaust his administrative remedies." *Fields v. Okla. State Pen.*, 511 F.3d 1109, 1112 (10th Cir. 2007) (quoting *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (alteration in original)).  Because Plaintiff took no further action after receiving responses to his grievances, he never exhausted all available administrative remedies.  *Cf. Rashid v. Calbone*, 156 F. App'x 87, 90 (10th Cir. 2005) (unreported).  Thus, the Court lacks jurisdiction to hear Plaintiff's federal or state claims "with respect to prison conditions" at LCCF.  42 U.S.C. § 1997e(a).

## B.  No Constitutional Violation Occurred Here

Even were that not the case, the Court concludes that the *Martinez* Report produced facts that vitiate Plaintiff's claims on the merits.  No matter how the Court construes the Complaint— substantive due process, cruel and unusual punishment, medical negligence—the facts here show that Defendants are entitled to judgment as a matter of law.

Neither substantive due process nor the Eighth Amendment proves particularly hospitable to Plaintiff's claims.  Both standards require considerably more culpable conduct than mere negligence.  *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995) (Eighth Amendment requires "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."); *Gamble*, 429 U.S. at 105 ("[N]egligen[ce] in diagnosing or treating a medical condition does not [support] a valid claim . . . under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Here, Defendant Centurion concedes, as it should, that Plaintiff falls within the "special relationship" exception.  FMSJ at 24.  But Plaintiff does not allege conduct that, even with every available reasonable inference, could possibly be considered constitutionally culpable by a jury.

Negligence does not satisfy either standard. "A plaintiff must do more than show that the government actor intentionally or recklessly caused injury." *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006). "The fact that an inmate may prefer or believe that another course of treatment was warranted is not evidence of a constitutional violation." *Duran v. Curry Cnty. Adult Det. Ctr.*, No. 09-cv-0758, 2013 WL 12172090, at *9 (D.N.M. July 29, 2013) (unreported) (internal citation omitted).[9]

In sum, there is no genuine dispute of material fact regarding Plaintiff's claims and—no matter how the claims are construed—Defendants are entitled to judgment as a matter of law.

**C. New Mexico's State Constitutional and Statutory Equivalents Change Nothing**

As mentioned above, the Court likely lacks jurisdiction over Plaintiff's constitutional claims absent his exhaustion of administrative remedies. Even were that not the case, as explained below, Plaintiff's invocation of the New Mexico Tort Claims Act ("NMTCA") cannot support his claim here should the Court construe his claims as tort claims. Nor could the Court properly construe his Complaint as invoking the New Mexico Civil Rights Act ("NMCRA").

The New Mexico Tort Claims Act immunizes a public employee from suit "except as waived by . . . Sections 41-4-5 through 41-4-12" of the NMTA. N.M. Stat. Ann. § 41-4-4; *accord* N.M. Stat. Ann. § 41-4-4 to -12 (1978). Within that range of exceptions, the NMTCA forbids holding public employees "liabil[e] for damages resulting from . . . their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." N.M. Stat. Ann. § 41-4-9 (1978). The exception applies when a plaintiff alleges negligence by a healthcare provider stemming from the provision of healthcare. *Cf. May v. Bd. of Cnty. Comm'rs*

---

[9] Moreover, Plaintiff appears to have a causation problem—no facts here clarify that Centurion personnel are somehow responsible for the delay between Plaintiff's consultation and surgery. Insofar as his Complaint does not blatantly contradict the record, the facts here show that Centurion staff attended to Plaintiff's injury that day, diagnosed him, and provided him ameliorative medical supplies until he could see an offsite specialist for surgery.

*of Dona Ana Cnty.*, 426 F. Supp. 3d 1013, 1022 (D.N.M. Sept. 27, 2019).   Although "a governmental entity 'remains liable for any constitutional deprivations caused by the policies or customs of'" a third party providing inmates healthcare, the constitutional obligation to provide inmates healthcare does not "equate[ ] with waiver of immunity for negligent operation of an infirmary under the [NM]TCA." *Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 30, 144 N.M. 314, 320.   Here, Plaintiff's Complaint clearly attempts to state a negligence claim against Defendant Centurion stemming from the healthcare services its employees provided him.   Compl. at 1, 15–16.   Such a claim would fall squarely within NMTCA's medical facilities exception.   N.M. Stat. Ann. § 41-4-9 (1978).   As such, Defendant Centurion would be immune from suit as to Count II.   Further, the statute precludes Plaintiff's recovery should the Court construe the medical negligence claim as a constitutional claim.   *E.g.*, *Ford v. N.M. Dep't of Pub. Safety*, 1994-NMCA-154, ¶ 26, 119 N.M. 405 ("We have previously held that absent a waiver of immunity under the Tort Claims Act, a person may not sue the state for damages for violation of a state constitutional right.").

Nor does the NMCRA afford Plaintiff relief.   The Act, now codified at §§ 41-4A-1 to 41-4A-13, prohibits state and local government officials from subjecting others to a "deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico."   N.M. Stat. Ann. §§ 41-4A-1 *et seq.* (2021).   The New Mexico state legislature enacted the NMCRA on July 1, 2021—about two years after Plaintiff filed suit and about three years after the events that gave rise to this lawsuit.   But by its terms, the NMCRA is not retroactive.   N.M. Stat. Ann. § 41-4A-12 (emphasis added) ("Claims arising solely from acts or omissions that occurred *prior to* July 1, 2021 may *not* be brought pursuant to the New Mexico Civil Rights Act.").   Further, the Act requires that "[c]laims brought pursuant to the [NMCRA] shall be brought

exclusively against a public body." N.M. Stat. Ann. § 41-4A-3(C).  A plaintiff can hold a public body's agents liable under the Act, but only by suing the public body.  *Id.* (creating liability for the acts of those individuals "acting on behalf of, under color of or within the course and scope of" the public body's authority).  On its face, Plaintiff's Complaint contains no allegation that either Defendant committed any "act" or "omission" on or after July 1, 2021.  Nor does Defendant Valeriano fall within the definition of a public body.  Consequently, the Court concludes that Plaintiff is not entitled to relief under the NMCRA even if the Court were to construe any of his claims as invoking it.

### D.  The Facts Do Not Satisfy the Elements of Either Tort Claim

Medical negligence, as defined by New Mexico law, requires, inter alia, proof of the standard of care.  *E.g.*, *Villalobos v. Bd. of Cnty. Comm'rs of Dona Ana Cnty.*, 2014-NMCA-044, 322 P.3d 439.  Such proof must come from expert testimony.  *Id.*  Insofar as Plaintiff's Complaint claims medical negligence, he offers no evidence of what that standard is.  Nor does the *Martinez* Report. Absent any evidence of the standard, no reasonable jury could reach a verdict in Plaintiff's favor. Thus, here too, Defendants would secure this claim's dismissal on summary judgment if the Court had jurisdiction.

## V.  CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims.

**IT IS THEREFORE RECOMMENDED** that Defendants' MSJ and FMSJ be **GRANTED.**

**IT IS FURTHER RECOMMENDED** that Plaintiff's Complaint [ECF 1-2] and this case be **DISMISSED WITHOUT PREJUDICE**.

**SO RECOMMENDED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**.